UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

JOSEPH A. ARNOLD,                        )
                                         )
        Plaintiff,                       )
                                         )
vs.                                      )
                                         )   Cause No.  1:12-cv-1573-WTL-TAB
CAROLYN W. COLVIN, acting                )
Commissioner of the Social Security      )
Administration,                          )
                                         )
        Defendant.                       )

ENTRY ON JUDICIAL REVIEW

Plaintiff Joseph A. Arnold requests judicial review of the final decision of Defendant,

Carolyn W. Colvin, Commissioner of the Social Security Administration ("Commissioner"),

denying Mr. Arnold's application for Disability Insurance Benefits ("DIB") under Title II of the

Social Security Act ("the Act").  The Court rules as follows.

I.      APPLICABLE STANDARD

Disability is defined as "the inability to engage in any substantial gainful activity by

reason of a medically determinable mental or physical impairment which can be expected to

result in death, or which has lasted or can be expected to last for a continuous period of at least

twelve months." 42 U.S.C. § 423(d)(1)(A).  In order to be found disabled, a claimant must

demonstrate that his physical or mental limitations prevent him from doing not only his previous

work, but any other kind of gainful employment which exists in the national economy,

considering his age, education, and work experience. 42 U.S.C. § 423(d)(2)(A).

In determining whether a claimant is disabled, the Commissioner employs a five-step

sequential analysis.  At step one, if the claimant is engaged in substantial gainful activity

("SGA") he is not disabled, despite his medical condition and other factors. 20 C.F.R. § 404.1520(b).  At step two, if the claimant does not have a "severe" impairment (i.e., one that significantly limits his ability to perform basic work activities), he is not disabled. 20 C.F.R. § 404.1520(c).  At step three, the Commissioner determines whether the claimant's impairment or combination of impairments meets or medically equals any impairment that appears in the Listing of Impairments, 20 C.F.R. pt. 404, subpt. P, App. 1, and whether the impairment meets the twelve-month duration requirement; if so, the claimant is deemed disabled. 20 C.F.R. § 404.1520(d).  At step four, if the claimant is able to perform his past relevant work, he is not disabled. 20 C.F.R. § 404.1520(f).  At step five, if the claimant can perform any other work in the national economy, he is not disabled. 20 C.F.R. § 404.1520(g).

   In determining whether a claimant who was found disabled continues to be disabled, the ALJ follows an eight-step process. 20 C.F.R. § 404.1594.  In the first step, the ALJ must determine if the claimant is engaging in SGA; if so, the claimant no longer is disabled. 20 C.F.R. § 404.1594(f)(1).  If the claimant is not engaged in SGA, step two requires the ALJ to determine whether the claimant has an impairment or combination of impairments that meets or medically equals the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1.  If the claimant does, his disability continues. 20 C.F.R. § 404.1594(f)(2).  At step three, the ALJ must determine whether medical improvement has occurred. 20 C.F.R. § 404.1594(f)(3).  Medical improvement is any decrease in the medical severity of the claimant's impairment(s) that were present at the time of the most recent favorable medical decision that the claimant was disabled or continued to be disabled. 20 C.F.R. § 404.1594(b)(1).  If medical improvement has occurred, the analysis proceeds to the fourth step.  If not, the analysis proceeds to the fifth step.

At step four, the ALJ must determine whether the medical improvement is related to the ability to work. 20 C.F.R. § 404.1594(f)(4).  If so, the analysis proceeds to step six.  At step five, the ALJ must determine if an exception to medical improvement applies. 20 C.F.R. § 404.1594(f)(5).  There are two groups of exceptions. 20 C.F.R. §§ 404.1594(d), (e).  If an exception from the first group applies, the analysis proceeds to the next step.  If an exception from the second group applies, the claimant's disability ends.  If no exception applies the claimant's disability continues.

Step six requires the ALJ to determine whether all the claimant's current impairments in combination are severe. 20 C.F.R. § 404.1594(f)(6).  If all current impairments in combination do not significantly limit the claimant's ability to do basic work activities, the claimant no longer is disabled.  If they do, the analysis proceeds to the next step.  At step seven, the ALJ must assess the claimant's residual functional capacity ("RFC") based on the current impairments and determine if he can perform past relevant work. 20 C.F.R. § 404.1594(f)(7).  If the claimant has the capacity to perform past relevant work, his disability has ended. If not, the analysis proceeds to the last step.  At the last step, the ALJ must determine whether other work exists that the claimant can perform, given his RFC and considering his age, education, and past work experience. 20 C.F.R. § 404.1594(f)(8).  If the claimant can perform other work, he no longer is disabled.  If the claimant cannot perform other work, his disability continues.

In reviewing the ALJ's decision, the ALJ's findings of fact are conclusive and must be upheld by this court "so long as substantial evidence supports them and no error of law occurred." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *id.*, and this Court may not reweigh the evidence or substitute its judgment for that

of the ALJ. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).  The ALJ is required to articulate only a minimal, but legitimate, justification for his acceptance or rejection of specific evidence of disability. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004).  In order to be affirmed, the ALJ must articulate his analysis of the evidence in her decision; while he "is not required to address every piece of evidence or testimony," he must "provide some glimpse into [his] reasoning . . . [and] build an accurate and logical bridge from the evidence to [his] conclusion." *Dixon*, 270 F.3d at 1176.

## II. **BACKGROUND**

Joseph Arnold protectively filed for DIB on February 6, 2009, alleging he became disabled on January 15, 2008, due to multiple physical impairments.  Mr. Arnold was born on July 28, 1968, and was thirty-nine years old on the alleged disability onset date.  He graduated from high school and has prior relevant work experience as an auto mechanic, carpenter, roofer, and die machine operator.

Mr. Arnold's application was denied on May 6, 2009, and upon reconsideration on May 28, 2009.  Following the denial upon reconsideration, Mr. Arnold requested and received a hearing in front of an Administrative Law Judge ("ALJ").  A video hearing, during which Mr. Arnold was represented by counsel, was held in front of ALJ John K. Kraybill on January 18, 2011.  The ALJ issued his partially favorable decision on May 19, 2011, concluding that Mr. Arnold was disabled within the meaning of the Social Security Act from January 15, 2008, through January 31, 2010.  As of February 1, 2010, however, the ALJ found that Mr. Arnold could perform other work because of medical improvements.  The Appeals Council denied Mr. Arnold's request for review on August 29, 2012.  Mr. Arnold then filed this timely appeal.

*Medical Evidence*

Mr. Arnold's medical evidence begins in 2007 when he saw Dr. Ritu Madan, a rheumatologist, due to complaints of widespread pain, achiness, and muscle weakness.  Dr. Madan diagnosed Mr. Arnold with fibromyalgia and chronic back and hand pain.  Mr. Arnold had x-rays taken of his spine, hands, wrists, feet, and ankles on February 24, 2007.  Based on these results indicating degeneration, Dr. Madan referred Mr. Arnold to Dr. Vishwajit Brahmabhatt for pain management.   Dr. Brahmabhatt recommended epidural injections to help alleviate Mr. Arnold's severe pain—Mr. Arnold received three injections on March 27, 2007, April 23, 2007, and April 30, 2007.

In late 2007, Mr. Arnold began a course of physical therapy to increase his range of motion and improve his mobility.  His physical therapist noted that Mr. Arnold's pain was aggravated by sitting and reaching.  October 17, 2007, x-rays also revealed degenerative changes in his vertebrae and both knees.  On October 30, 2007, Mr. Arnold underwent an MRI of his cervical spine, revealing disc bulges and os odontoideum.  Mr. Arnold saw Dr. Ravishankar Vedantam, an orthopedic surgeon, on November 21, 2007, for neck pain, weakness in his right upper extremity, and numbness of the fingers in his right hand.  Dr. Vedantam opted to perform surgery on Mr. Arnold.  Therefore, on January 22, 2008, Mr. Arnold had a C1-C2 posterior arthrodesis with right iliac bone grafting performed.  It took until July 17, 2008, for a CT scan to confirm that the fusion was solid.

Even after the surgery, Mr. Arnold experienced pain in his neck and upper extremities as well as numbness in his right hand and fingers.  He had an MRI of his right shoulder in September 2008, which suggested myotonic myopathy.  He also reported to Dr. Vedantam that he was experiencing occasional headaches.

On November 20, 2008, Mr. Arnold met with Dr. Kelly Parnell, a neurologist, for persistent muscle pain.  Dr. Parnell prescribed Trileptal and Baclofen for Mr. Arnold's pain.  About a month later, Mr. Arnold saw Dr. Parnell again.  Dr. Parnell noted that Mr. Arnold was doing poorly and not responding to the medication, so she increased his dosage.  Mr. Arnold saw Dr. Eric Potts for a neurosurgery consultation, and underwent a myelogram in January 2009.  In February 2009, Mr. Arnold met with Dr. Parnell, complaining of severe and throbbing headaches, neck and shoulder pain, and numbness and tingling in his arms and shoulders.  Mr. Arnold received injections in February and March 2009 to help alleviate his pain.

On April 24, 2009, Mr. Arnold saw Dr. Shuyan Wang, a State Agency doctor, for a consultative physical examination.  Dr. Wang observed right arm pain, a grinding sensation with cervical movement, limited motion in the lumbar spine, positive straight leg raising tests, tenderness in the shoulders, pain in the right hip and knee, and heel pain when walking.  He opined that while Mr. Arnold may need restrictions for lifting and/or carrying weights as well as pushing and pulling, with appropriate treatment, he could work eight hours a day.  He noted that Mr. Arnold would need to periodically change positions.

Mr. Arnold had a follow-up appointment with Dr. Parnell in June 2009.  She ordered a CPAP device to help him sleep and discussed possible physical therapy.  Mr. Arnold saw Dr. Vedantam again on June 17, 2009, complaining of back and leg pain.  He described numbness in his lower extremities and noted that his feet turned purple in color if he sat for too long.  Dr. Vedantam observed a positive sciatic stretch test.  Mr. Arnold underwent a lumbar spine MRI on July 3, 2009, revealing degenerative disc and facet joint disease, as well as disc bulges and protrusions.  In August 2009, he underwent EMG testing, revealing carpal tunnel syndrome and

mytonia.  He continued to treat with Dr. Parnell for the duration of 2009 for migraine headaches, fatigue, and muscle pain.

Mr. Arnold saw Dr. William Toedebusch on January 21, 2010 and received nerve blocks on January 22, 2010, and January 29, 2010.  Mr. Arnold saw Dr. Parnell again in February 2010, indicating that his pain was improved in his legs and hips but that he continued to have neck and back pain.  He had a CT scan of his pelvis performed in April 2010, revealing chronic calcification.  Dr. Parnell prescribed Mexelitine for Mr. Arnold's muscle spasms.

In May 2010, Mr. Arnold presented to Dr. Gregory Woods for an orthopedic consultation regarding his hip and knee pains.  He had a MRI of his right knee performed, revealing a meniscal cyst and possible tear, as well as a bulbous appearance of the ACL.  Mr. Arnold saw Dr. Parnell later that month, complaining of pain, and received prescriptions for Maxalt and Neurotonin.  As a result of his MRI on his knee, Dr. Woods injected Orthovisc into Mr. Arnold's right knee on October 20, 2010, October 29, 2010, and November 12, 2010.  Nevertheless, Mr. Arnold's knee pain persisted.  At a follow-up appointment with Dr. Parnell, Mr. Arnold complained of numbness in his lower extremities and hands and frequent, and severe headaches.

*Hearing Testimony*

At the hearing, Mr. Arnold testified that he was unable to work due to his physical condition.  He testified that he lives in Richmond, Indiana with his wife.  He was laid off from his job in 2008 and has not worked since that date; however, before he was laid off, he was having issues performing his job due to his muscle pain and cramps.  He testified that he has problems with the muscles in his back and legs, and he experiences cramps and numbness in his hands and arms.  He also testified that he experiences regular migraine headaches approximately once a week.  Mr. Arnold noted that he has taken several different pain medications, received

numerous injections in various parts of his body, had participated in physical and aquatic

therapy, and uses a CPAP every night to help him sleep. Despite all of this, his pain still persists.

Dr. Ashok G. Jilhewar, a medical expert, also testified. He discussed Mr. Arnold's

relevant medical history, concluding that Mr. Arnold's condition equaled Listing 1.04(a) from

the date of the alleged onset until January 31, 2010, immediately after Mr. Arnold received two

nerve blocks. Because Dr. Jilhewar noted that there was no evidence of "specific intensive

management of the low back pain" after the nerve blocks, he opined that Mr. Arnold's condition

no longer met the Listing as of February 1, 2010. With regard to his RFC, Dr. Jilhewar

concluded that Mr. Arnold retained the ability to sit for two hours at a time, to stand or walk for

thirty minutes at a time, and disagreed with Mr. Arnold's own testimony that he needed to

change his position due to his pain every twenty minutes. He further concluded that Mr. Arnold

could lift eight pounds frequently, could occasionally reach overhead with his right upper

extremity, and could occasionally stoop, bend, balance, kneel, or crawl. He testified that Mr.

Arnold could not engage in continuous repetitive movements with his upper extremities, could

never climb ropes or scaffolds, and could not work at unprotected heights.

Finally, the ALJ heard testimony from the vocational expert ("VE"). The VE testified

that with the limitations described by Dr. Jilhewar, a hypothetical individual with Mr. Arnold's

age, education level, and past work experience would be precluded from performing Mr.

Arnold's past relevant work. However, the VE testified that such a person could perform as an

information clerk, order clerk, or assembler.

### III. DISCUSSION

In his brief in support of his complain, Mr. Arnold argues that the ALJ erred in finding

his testimony to not be credible, by assessing a physical RFC that is not supported by substantial

evidence, and in failing to adequately articulate whether he experienced a medical improvement.
His arguments will be addressed, in turn, below.

### A.  Credibility

Mr. Arnold's first argument is that the ALJ failed to adequately articulate the basis for his
conclusion that his testimony regarding his functional limitations after February 1, 2010, was not
credible.  In his decision denying benefits, the ALJ said "the claimant's statements concerning
the intensity, persistence, and limiting effects of these symptoms are not credible beginning on
February 1, 2010, to the extent they are inconsistent with the residual functional capacity
assessment for the reasons explained above." R. at 19.  In so concluding, the sole piece of
evidence the ALJ relied on was the opinion of Dr. Jilhewar, the medical expert, to which the ALJ
assigned "great weight." *Id*.  The Commissioner argues that the ALJ properly relied on Dr.
Jilhewar's opinion in determining whether Mr. Arnold's subjective complaints were supported
by the record.

The Court agrees with Mr. Arnold that the ALJ committed reversible error in this
instance.  It is true that the ALJ can rely on medical experts to help navigate what oftentimes is,
as is in Mr. Arnold's case, a rather complicated medical record; however, Social Security Ruling
("SSR") 96-7p cautions, "the absence of objective medical evidence supporting an individual's
statements about the intensity and persistence of pain or other symptoms *is only one factor* that
the adjudicator must consider in assessing an individual's credibility and must be considered in
the context of all the evidence." (emphasis added).  The Commissioner's argument therefore that
"a reasonable reading of the ALJ's decision demonstrates that the ALJ concluded that Dr.
Jilhewar had properly evaluated the medical record and himself concluded that Plaintiff's self-
reports of disabling limitations were not consistent with or supported by the medical record after

9

February 1, 2010," Response at 5, misses the mark.  The problem lies not in the ALJ's treatment of Dr. Jilhewar's opinion, it lies in the ALJ's failure to consider, or even cite to, any other evidence in assessing Mr. Arnold's credibility. *See Bjornson v. Astrue*, 671 F.3d 640, 645-46 (7th Cir. 2012) (noting the "tension" between the same "boilerplate language" used in Mr. Arnold's case and SSR 96-7p which states "an individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence.").  The Court agrees with Mr. Arnold that "the ALJ here made no effort to independently evaluate the claimant's allegations or articulate why they were discounted as required by SSR 96-7p," Pl.'s Reply at 2, and thus remand is required.

**B.  RFC**

Mr. Arnold next argues that the ALJ's physical RFC is not supported by substantial evidence.  He argues the ALJ erred in concluding he could sit for a prolonged period of time, failed to incorporate his migraine headaches into his RFC, and failed to discuss the opinion of Dr. Parnell.  Again, the Court agrees.

The ALJ concluded that Mr. Arnold could sit for two hours at a time, for a total of eight hours in a day.  Mr. Arnold, however, testified that he could only sit for approximately fifteen to twenty minutes at a time before needed to change his position.  When Dr. Jilhewar testified at the hearing, he noted that "there is no evidence regarding an impairment affecting the sacroiliac joint" and that therefore he did "not understand the testimony today that the claimant has to change his position in 20 minutes from sitting to standing.  It depends on Your honor how much weight you give to that testimony." R. at 51.  The ALJ decided to give "little weight" to Mr.

Arnold's "testimony that he has to change his position between sitting and standing" as it was inconsistent with Dr. Jilhewar's opinion. *Id*. at 19.

Regardless of whether an impairment of this joint is the only reason one's ability to sit for prolonged periods of time may be affected, the ALJ, once again, impermissibly relied solely on Dr. Jilhewar's opinion in assessing whether Mr. Arnold was credible in his complaints. There is other evidence in the record indicating that Mr. Arnold has difficulty sitting—and despite the Commissioner's argument to the contrary, not all of the notations are based on Mr. Arnold's subjective complaints. *See, e.g.*, R. at 1032 (Dr. Wang, after observing hip pain "with right hip external rotation motion," noted that Mr. Arnold "may need to periodically change position from sitting.");[1] *Id*. at 1051 ("His symptoms of numbness in both lower extent is present only when he is in the sitting position seems to suggest compression neuropathy/neuropraxia of the sciatic nerve caused by the prolonged sitting."). The failure of the ALJ in this case to cite to anything besides Dr. Jilhewar's conclusion in regard to Mr. Arnold's ability to sit for two hours constitutes reversible error. *See* SSR 96-7p which states "an individual's statements . . . about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence.").

With regard to his migraine headaches, the Court is puzzled by Dr. Jilhewar's conclusion, which the ALJ relied on and cited in his decision, that "there was no evidence of chronic daily headaches requiring visits to the emergency room, hospitalizations, or pain clinic evaluations." R. at 49. This conclusion is irrelevant, as Mr. Arnold never complained of daily headaches nor

---

[1] The Commissioner argues that "it is clear that Dr. Wang's statement was based in significant part on Plaintiff's subjective reports of trouble sitting for prolonged period—subjective reports that the ALJ reasonably discredited." Response at 9. The Commissioner offers no support for why she believes Dr. Wang's notation was based on a subjective report of Mr. Arnold and not on his own examination of Mr. Arnold, in which Dr. Wang found Mr. Arnold's complaints of pain to be consistent with his observations.

did he testify that his headaches required him to go to the emergency room.  He did, however, testify that he experiences severe, debilitating migraine headaches approximately once a week that last anywhere from one to three days in length and that require him to "bury [his] head between two pillows and go to bed." *Id*. at 34.  It was not therefore reasonable for the ALJ to discount Mr. Arnold's allegations regarding his headaches because they were inconsistent with Dr. Jilhewar's medical opinion, because Dr. Jilhewar's medical opinion is irrelevant to the type of migraines Mr. Arnold testified he experiences and those which are reflected in the record. *See Id*. at 49 (Dr. Jilhewar testifying that "many of the office visits at the neurologist mentioned the presence of migraine headaches."); *see also Id*. at 1130, 1133, and 1137 (noting complaints of headaches).

Further, the ALJ's failure to consider Mr. Arnold's allegations of migraines was not harmless.  If Mr. Arnold experiences debilitating headaches once a week—sometimes lasting for as long as three days—and he has to remain in bed for the duration of that time, his absenteeism would prevent him from performing the work the ALJ described in his decision. *See id*. at 58 (testimony from the VE noting that "typical tolerances" of absenteeism "are one day or less per month.").  On remand, the ALJ shall consider the types of headaches Mr. Arnold describes he experiences, which are well documented in the record, and thoroughly consider how they may affect his RFC.

Finally, Mr. Arnold argues that the ALJ committed reversible error by failing to address the opinion of Dr. Parnell.  Dr. Parnell, a neurologist, began treating Mr. Arnold in November 2008 and has continued to see him on a regular basis for his pain.  Yet, the ALJ's decision is completely devoid of any reference of Dr. Parnell.  The Commissioner argues that the ALJ need not address every piece of evidence, and thus he properly excluded any discussion of Dr. Parnell,

or any of Mr. Arnold's other treating physicians.  However, the ALJ is not allowed to cherry-pick selective reports that support a finding of no disability—he must consider "all relevant evidence." *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009); *see also Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013) ("An ALJ must consider all medical opinions in the record.").

Here, the ALJ's decision does not reflect that he even considered Dr. Parnell's treatment notes and opinions.  While he noted that "Dr. Jilhewar's opinion . . . is . . . not contradicted by any of the claimant's treating physicians," R. at 19, he did not cite any evidence from Dr. Parnell illustrating this consistency.  In fact, Dr. Parnell's notes suggest that Mr. Arnold continued to experience pain in various parts of his body even after he received the 2010 nerve blocks, suggesting an inconsistency. *See* R. at 1218 (noting muscle pain); *id*. at 1223 (noting muscle pain, fatigue, headaches); *id*. at 1227 (noting insomnia, muscle pain, neck pain); *id*. at 1231 (noting back pain); *id*. at 1236 (noting back pain and that the 2010 nerve blocks provided pain relief for three days on Mr. Arnold's left side and only a few hours on his right side).  On remand, the ALJ shall consider the evidence in the record from Dr. Parnell and discuss how her treatment notes, documenting Mr. Arnold's pain, and her opinions might affect Mr. Arnold's RFC.[2]

---

[2] Dr. Parnell's notes reflect certain conclusions that she made regarding Mr. Arnold's ability to work. *See* R. at 1139 ("He still complains of muscle pain with exertion.  This will make it difficult for him to work."); *id*. at 1135 ("I doubt if he will be able to hold any type of employment as his congenital myotonia continues to evolve.").  The Commissioner argues that "[m]edical opinions that provide only conclusory statements regarding disability, like Dr. Parnell's opinions here, are of virtually no use." Response at 13.  The Court notes that this was not a reason the ALJ gave for why he disregarded her opinions and cannot be used at this stage to justify the ALJ's omission. *See Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir.2010) ("[T]he Commissioner advances a ground on which the ALJ did not rely, in violation of the *Chenery* doctrine.").

### C. Medical Improvement

Finally, Mr. Arnold argues that the ALJ erred by failing to adequately articulate whether he experienced a medical improvement.  "Medical improvement is . . . determined by a comparison of prior and current medical evidence which must show that there have been changes (improvement) in the symptoms, signs or laboratory findings associated with that impairment(s)." 20 C.F.R. § 404.1594(c)(1).  Once again, the only evidence the ALJ relied on in determining that a medical improvement occurred as of February 1, 2010, was Dr. Jilhewar's hearing testimony.  Dr. Jilhewar noted that Mr. Arnold received two nerve blocks at the end of January 2010 and after that date, "there has not been any specific intensive management of the low back pain." R. at 48.  The Court agrees with Mr. Arnold that this scant reference does not satisfy the ALJ's burden of pointing to specific improvements in Mr. Arnold's symptoms or specific medical tests or laboratory results indicating that Mr. Arnold's condition improved.  The Commissioner's argument, therefore, that Dr. Jilhewar's review of the record "supported the conclusion that his [Mr. Arnold's] functional ability was drastically improved following the nerve blocks Plaintiff underwent in January 2010" is untenable. Response at 14.  This is especially true in light of the fact that Dr. Parnell noted that the nerve blocks provided pain relief for three days on Mr. Arnold's left side and only a few hours on his right side. *See* R. at 1236. Remand is required such that the ALJ can adequately articulate how the record reflects that Mr. Arnold experience a medical improvement as of February 1, 2010.  On remand, if the ALJ desires a medical expert to help assist him in making this determination, he should elicit the specific medical facts from that expert that might support such a finding.

## IV.    CONCLUSION

As set forth above, in relying solely on the medical expert's opinion, the ALJ failed to

build an accurate and logical bridge to his conclusion that Mr. Arnold experienced a medical

improvement and that he could sustain the assessed RFC.  The decision of the Commissioner is

therefore **REVERSED AND REMANDED** for further proceedings consistent with this Entry.

SO ORDERED:   02/24/2014

_William T. Lawrence_
Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic notification